### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KENWELL TRADING LIMITED, | ) | 3:22-CV-00248 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PORCELEN LTD CT LLC, | ) | AUGUST 15, 2022 |
| *Defendant*. | ) | |

### ORDER GRANTING APPLICATION FOR PREJUDGMENT REMEDY (ECF No. 8)

This breach of contract action arises out of the purchase by Defendant Porcelen, Limited, Connecticut, LLC of certain fencing products from Plaintiff Kenwell Trading Limited ("Kenwell"). Plaintiff alleges that between November 2017 and May 2018, it received many purchase orders for product; that it filled these orders and delivered the product to the Defendant; and that the Defendant, though acknowledging the debt, has failed to pay for the product. Plaintiff seeks a prejudgment remedy in the amount of the allegedly outstanding invoices, an amount equal to $914,933.72. The Court convened a hearing on the pending application on July 6, 2022 and thereafter received proposed findings of fact and conclusions of law from the parties. For the reasons that follow, the application for prejudgment remedy is granted.

**Standard of Review**

Rule 64 of the Federal Rules of Civil procedure provides that prejudgment remedies available under state law are also available to litigants in federal court. *See Roberts v. TriPlanet Partners, LLC*, 950 F. Supp. 2d 418, 420 (D. Conn. 2013). "Generally speaking, a prejudgment remedy is intended to secure the satisfaction of a judgment should the plaintiff prevail." *Id.* (internal quotation omitted). And in Connecticut, prejudgment remedies are provided for by Connecticut General Statutes §§ 52-278a *et seq.*, which dictate that, generally, a hearing must be

1

held before a prejudgment remedy may be ordered. *See also Zdunkczuk v. Wieckowski*, No. CV030523441, 2005 WL 834360, at *3 (Conn. Super. Ct. Mar. 2, 2005) ("Prejudgment remedies are creatures of statute and are unknown to common law, therefore, statutory requirements must be followed strictly.").

The hearing on an application for prejudgment remedy "shall be limited to a determination of (1) whether or not there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff, (2) whether payment of any judgment that may be rendered against the defendant is adequately secured by insurance, (3) whether the property sought to be subjected to the prejudgment remedy is exempt from execution, and (4) if the court finds that the application for the prejudgment remedy should be granted, whether the plaintiff should be required to post a bond to secure the defendant against damages that may result from the prejudgment remedy or whether the defendant should be allowed to substitute a bond for the prejudgment remedy." Conn. Gen. Stat. § 52-278d(a). The hearing is not however "a full scale trial on the merits of the plaintiff's claim. . . . Rather, the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits. . . . The court must evaluate not only the plaintiff's claim but also any defenses raised by the defendant. . . . Damages need not be established with mathematical precision, but must be based on evidence yielding a fair and reasonable estimate." *Roberts*, 950 F. Supp. 2d at 421 (citations and internal quotations omitted).

The standard of probable cause is "not as demanding as proof by a fair preponderance of the evidence . . . The legal idea of probable cause is a bona fide belief in the existence of the facts

essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it . . . Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false . . . Under this standard, the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits. . . ." *Valencis v. Nyberg*, 160 Conn. App. 777, 782 (2015) (quoting *TES Franchising, LLC v. Feldman*, 286 Conn. 132, 136–38 (2008)) (further citations omitted).

**Findings of Fact**

The Court makes the following findings of fact based upon the evidence adduced at the hearing. These findings are for the purposes of adjudicating the application for prejudgment remedy and shall not be binding on the Court or the parties at later stages of the litigation. *See Roberts*, 950 F. Supp. 2d at 421; *Walsh v. St. Denis*, Civ. No. 3:17CV01032(AWT), 2017 WL 4163662, at *3 (D. Conn. Sept. 20, 2017).

In many respects, though not all, the events giving rise to this litigation are not in dispute.

Plaintiff is a private company organized under the laws of and based in Hong Kong that sells and exports materials used in the manufacture of fencing products. Defendant is a limited liability company headquartered and organized in Connecticut that sells finished fencing product to both residential and commercial customers. The Defendant's principal and member is G&S Metal Products Co., Inc., an Ohio Corporation with its principal place of business in Ohio.

Plaintiff's principal is Ka Man "Kelvin" Wong, who testified at the hearing. Mr. Wong has had a business relationship with the Defendant and its executives for many years. In 2017, Mr. Wong approached the Defendant about purchasing aluminum fencing products from his company.

The Defendant agreed and in November 2017 began purchasing fencing products from Mr. Wong's company.

At the beginning of this relationship, Mr. Wong was doing business as or through a company called Gold Kirin Limited ("Gold Kirin"). However, Mr. Wong advised the Defendant that he would be setting up a separate company for the fencing products because he wanted to keep separate his plastics business, performed by Gold Kirin, and his aluminum products business.

In the meantime, Gold Kirin received Defendant's orders. In 2017 or early 2018, Mr. Wong established Plaintiff Kenwell Trading Limited to sell/export fencing products to Defendant and, on April 26, 2018, provided Defendant with Kenwell's banking information for purposes of paying the invoices for the fencing products.

Between November 2017 and May 2018, Defendant placed orders, some of which were revised, for fencing materials by sending emails to Mr. Wong which included the specifications and quantity sought. Purchase orders were created to reflect these orders and invoices would issue following delivery. As some of the purchase orders pre-dated the formation of Kenwell Trading Limited, they were issued in the name of Gold Kirin. However, after Kenwell was established with a bank account, Mr. Wong re-issued purchase orders to reflect as much, in part, so that the names on the bank accounts (both payor and payee) were accurately reflected in the transaction documents.[1] Notably, the packing lists and invoices on the purchase orders were issued under Kenwell Trading Limited letterhead.

Kenwell filled each of the orders—there were 39 in total. The Defendant paid 18 of the invoices, many, if not all, of them as directed by Mr. Wong to the account of Kenwell Trading Limited at its Hong Kong bank. The Defendant failed to pay the remaining invoices.

---

[1] The Court rejects the Defendant's argument that these changes had some nefarious purpose, at least on this record.

The business relationship was not a seamless one. There were delays in the delivery of the goods and the Defendant raised several concerns regarding order specifications and/or delivery of the product.

The Defendant made its last payment to Kenwell in September 2018. Thereafter, Mr. Wong began "chasing the payment." As Mr. Wong sought reassurance that the outstanding invoices would be paid, the Defendant—on more than one occasion—acknowledged the debt. The Defendant never claimed to have not received the products; never voiced concerns about the quality of the product; and never indicated an unwillingness to pay for the product. At one point, the Defendant explained that it had lost one of its biggest customers, which was impacting its cashflow and ability to pay Kenwell. In response, Mr. Wong inquired whether the customer was lost as a result of any concerns regarding Kenwell's products. The Defendant responded that there were no such concerns expressed.

In approximately October 2018, an unknown bad actor began impersonating Mr. Wong in communications with Defendant. It is unknown whether the bad actor hacked the Defendant's system and discovered the relationship with Kenwell or whether the bad actor hacked Kenwell's system and learned of the relationship. Although at various times Mr. Wong acknowledged that he was or may have been hacked, the original situs of the computer intrusion has never been conclusively determined.

The bad actor took up an aggressive effort of collecting on the unpaid invoices through a series of emails. In so doing, the bad actor was able to mimic Mr. Wong's style of communicating and even mentioned other people about whom Mr. Wong had previously communicated. In this vein, the bogus emails were very convincing. The bad actor also sent multiple different emails instructing the Defendant to wire payments to multiple different banks in different places and to

different people or entities. In response, the Defendant sent wire transfers totaling $344,834.84 at the direction of the bad actor. Eventually, a bank in Florida flagged one of the wire transfers as potentially fraudulent. The bad actor was thereafter revealed and the Defendant stopped sending money.

Kenwell seeks a prejudgment remedy in the amount of $914,933.72, the full amount of the unpaid invoices. Defendant objects to any prejudgment remedy but argues in the alternative that the amount paid to the bad actor and losses occasioned by the delays should off-set any such remedy.

**Discussion**[2]

Plaintiff first brings a breach of contract claim. Although the Defendant relies heavily on the fact that the purchase orders were directed to Gold Kirin and not Kenwell, the Court finds probable cause to believe that Plaintiff will prevail on its breach of contract claim.[3] The parties' course of conduct, the ordering of the product through Kenwell's principal Mr. Wong, the delivery of the product, the invoicing by Kenwell, and Defendant's payment to the Kenwell bank account are sufficient to demonstrate a contract for the purchase and sale of goods. *See* CISG Art. 9(1) ("[T]he parties are bound by any usage to which they have agreed and by any practices which they have established between themselves."); Conn. Gen. Stat. § 42a-2-204(1) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."). *See also McCarter & English LLP v. Jarrow Formulas, Inc.*, Civ No. 3:19CV01124 (MPS), 2020 WL 2528508, at *6–*7 (D. Conn. Mar. 3,

---

[2] The parties agreed that for purposes of the prejudgment remedy application, the Court need not decide whether the case will be decided under Connecticut law or, alternatively and as posited by the Plaintiff, the Convention on Contracts for the International Sale of Goods ("CISG").

[3] Because the Court finds probable cause for the breach of contract claim and awards a prejudgment remedy in the full amount sought by the Plaintiff, the Court does not consider whether there is probable cause to support Plaintiff's other causes of action.

2020) (finding probable cause for a breach of contract claim where the defendant had a history of paying plaintiff's invoices); *Supercase Enter. Co., Ltd. v. Marware, Inc.*, No. 14-61158-CIV-DIMITROULEAS, 2014 WL 12495261, at *4 (S.D. Fla. Nov. 24, 2014) (discussing a breach of contract claim under CISG); *Urica, Inc. v. Pharmaplast S.A.E.*, No. CV 11-02476 MMM (RZx), 2014 WL 3893372, at *13 (C.D. Cal. Aug. 8, 2014) (same). This conclusion is bolstered by the many times the Defendant acknowledged the debt to Kenwell. These acknowledgements were essentially admissions of liability. Although the Defendant has raised questions as to the identity of the various entities involved in the contracting process as well as the export and delivery of the product, at this stage of the proceedings the Court is satisfied that the Defendant understood it was entering into purchase order contracts first with Gold Kirin and then with Kenwell through Mr. Wong and that Kenwell would arrange for the manufacture, export, and delivery of the product. The Defendant's after the fact reconstruction of the parties' relationship does not significantly undermine the weightier evidence that Plaintiff Kenwell is owed money for the unpaid invoices.

**Set-Off for Delays in Delivery**

Defendant seeks an unspecified set-off for the delays which occurred with respect to the delivery of the product. Although there were delays in delivery caused by a variety of factors, the Defendant did not at any point reject delivery of the products due to late delivery. Nor are the delays themselves a cause to set-off some undefined amount equal to whatever loss may have been incurred because of a delay. Defendant asserts that its selling season is in the spring and summer, and that the delayed delivery of the product impacted its sales. However, there have now been almost four full selling seasons since the invoices came due. Any delay in delivery in 2018, even if it impacted the 2018 selling season, is mitigated by the fact that the product has been in Defendant's inventory for the four selling seasons since then.

**Set-Off for Fraud**

The Defendant asserts that Plaintiff should bear responsibility for the loss occasioned by the bad actor and that any attachment should be reduced by $344,834.84. The Defendant would shift its status as the victim of the fraud to the Plaintiff. The Defendant principally relies on the allegations that it was Mr. Wong's computer that was likely hacked; that the ability of the bad actor to mimic Mr. Wong's manner of communicating renders Defendant's belief in the legitimacy of the emails reasonable; and that the changing wire instructions did not raise any red flags because Mr. Wong had, during the course of the business relationship, given new wire transfer instructions. Alternatively, the Defendant asserts that it is too soon in the litigation to determine which party should bear the brunt of the fraud and therefore these amounts should not be included in any prejudgment remedy.

Plaintiff counters that the Defendant ignored multiple red flags that should have alerted them to the bad actor's presence and fraudulent scheme. For example, the e-mail address used by the fraudster was different from (though similar to) Mr. Wong's email address. In addition, the fact that multiple wire transfer instructions were to places throughout the United States and to various persons and entities should have also alerted the Defendant. Most, if not all, of the previous 18 payments had been sent to Plaintiff's bank in Hong Kong. Moreover, the email communications with the fraudster which began in October 18, 2018 (from a different email address) contained none of the previous (real) emails that dated back to June 2018.

The manner and means by which this bad actor was able to accomplish this swindle remain unclear. The dates and times of the emails in some respects make no sense. It is concededly bizarre that bogus emails appear attached to real e-mails. It is unclear the extent to which either the Defendant's system or the Plaintiff's system was compromised and whether the bad actor had

ongoing or continuous access to either system so as to control and manipulate communication between the two, though it appears this may well have been the case.

Until some of these questions are answered, and on the present facts found above, the Court is unwilling to shift the loss occasioned by this fraud from the Defendant, the direct object of the fraudulent scheme, to the Plaintiff, who is still owed money for the product delivered. *See Peeples v. Carolina Container, LLC*, 4:19-cv-21 MLB, 2021 WL 4224009, at *7–*8 (N.D. Ga. Sept.16, 2021) (discussing and rejecting the imposter rule in the context of a breach of contract caused by third-party fraudsters); *Jetcrete N. Am. LP v. Austin Truck & Equip., Ltd.*, 484 F. Supp. 3d 915, 920 (D. Nev. 2020) (discussing which party was in the best position to avoid an email fraud); *Arrow Truck Sales, Inc. v. Top Quality Truck & Equip., Inc.*, No. 8:14-cv-2052-T-30TGW, 2015 WL 4936272, at *5 (M.D. Fla. Aug. 18, 2015) (assessing which party should suffer the loss occasioned by a third-party fraudster by determining which party was in the best position to prevent the fraud).[4]

The Application for a Prejudgment Remedy is GRANTED in the amount of $914,933.72. The Plaintiff may attach sufficient real and personal property of the Defendant to secure such sum, to include: (1) Defendant's interest in real property at 333 Welton Street, Hamden, Connecticut or (2) other funds or real or personal property within the state of Connecticut in which Defendant has an interest as might be revealed upon Defendant's disclosure of assets as ordered this same day at ECF No. 54.

**Bond**

---

[4] The Court further observes that it is not clear that Defendant's arguments in this regard have traction under either Connecticut law or the CISG. It does not appear that Connecticut law, under these circumstances, has recognized the so-called "imposter rule" or its various iterations by which the party in the best position to prevent the fraud or loss is the party who will suffer the loss. The parties cite no Connecticut authority, and the Court has found none. Further, the parties do not cite any cases where this rule was applied under the provisions of the CISG.

Pursuant to Conn. Gen. Stat. § 52-278d(d), the Court can order the Plaintiff to post a bond in order to protect the Defendant's interests in the property that is the subject of the prejudgment remedy. Defendant asks for a bond in twice the amount of the remedy, though offers no explanation or justification for this request. Defendant does not identify any interest at risk that needs to be protected nor points to any record evidence from which such an assessment might be made. A bond is not statutorily required, *see Giordano v. Giordano*, 39 Conn. App. 183, 204 (1995), and the Defendant has offered no basis upon which one should be ordered. The request for a bond is DENIED without prejudice.

**SO ORDERED** at Bridgeport, Connecticut, this 15th day of August 2022.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE